### SELDEN CO. v. BARRETT CO.

#### No. 4316.

Circuit Court of Appeals, Third Circuit.

July 11, 1930.

Rehearing Denied April 21, 1931.

Alter, Wright & Barron, of Pittsburgh, Pa. (H. Dorsey Spencer, of New York City, and R. A. Norton, of Pittsburgh, Pa., of counsel), for appellant.

Pennie, Davis, Marvin & Edmonds, of New York City (W. Brown Morton and R. B. Canfield, both of New York City, of counsel), for appellee.

Before BUFFINGTON and DAVIS, Circuit Judges, and JOHNSON, District Judge.

BUFFINGTON, J.

This case concerns the validity and alleged infringement of patent No. 1,604,739, granted October 26, 1926, to C. R. Downs for "an apparatus for promoting catalytic reactions." The apparatus is used for the commercial production of phthalic anhydride, and more than half of that article used in the United States was produced by the two companies litigating this case. The opinion of the court below so fully sets forth the subject-matter of the art, patent, etc., that we avoid needless restatement thereof by referring thereto and limiting ourselves to general rather than detail statements. The apparatus shown by the patentee was designed, first, to secure largely increased product; and second, this by temperature control. That such increase was effected by the patented device is thus stated by the trial judge:

"The patentee in the instant suit made no startling discovery in chemistry, but he did produce a *converter which was new, and which vastly increased the ability to manufacture phthalic anhydride*. The facts established by the testimony are sufficient, it would seem, to overcome defendant's contention that the plaintiff's device was the result of only ordinary chemical engineering skill. The patentee, Downs, was an experienced chemical engineer engaged in research work. *He completed his converter only after numerous experiments and long pursuit of his basic ideas*. The defendant had in its organization able chemical engineers, one of them Mr. Conover, the inventor of a converter which is alleged to have anticipated Downs. These engineers had not been able to build a converter which compared in efficiency with that of Downs prior to the time when the latter put his device into actual use. At least, prior to Downs, the defendant used a form of converter by which it produced *70 to 75 pounds of phthalic* acid per day from each converter; and upon becoming acquainted with Downs' form, it promptly replaced its type of converter with the new form, and thereafter was able to produce *750 to 800 pounds of greatly improved quality*."

As to the control of temperature by the apparatus, it will be noted that all of the mechanism and the principles utilized by the patentee in its construction and operation were singly and in themselves well known, or, as found by the court, "no individual feature of the patent in suit represents a discovery in physics or chemistry." Indeed

the prior use in laboratory practice of many of the agencies and principles used by the patentee is shown, but, in spite of such knowledge, no one had, previous to Downs, been able to apply them to make a commercial apparatus. The situation was summarized by Dr. Gibbs, who carried on extensive governmental efforts looking toward an increased production of phthalic anhydride during the war. His testimony in reference to laboratory possibilities was: "It is well known that many oxidation reactions are exothermic, but it is very difficult to carry on these reactions on a large scale practicable for commercial operations and remove the large amount of heat generated in the process of the reaction. It is also well known that many of these reactions will proceed in a very satisfactory manner on a smaller scale, but on a large scale the concentration of the large amount of heat in the apparatus results in the destruction of the apparatus, and the rapid combustion of the desired products of reaction, resulting in unsatisfactory yields."

The protracted and unsuccessful efforts made to apply the laboratory knowledge and apparatus to use on a commercial scale were testified to at length by Downs, the patentee. Of the first apparatus he testified: "Our first attempt to design a commercial apparatus for this work was to adopt what we could from the known art, and we erected a piece of apparatus that was very similar in construction to the Knietsch equipment, which, by the way, was cited in the patent wrapper, as well as described therein. That was a catalyst chamber made out of tubes immersed in a furnace. We set up a furnace with these tubes in it. The tubes were six inches in diameter, and a small catalyst cartridge was placed at the bottom of the tubes. The cartridge was about six inches in diameter and about three inches deep. The amount of heat was so great that we ended up with a fused catalyst. That was the first apparatus we installed. We knew in a general way before we built this apparatus the amount of heat that was formed, but we were working with a mixture that had a deficiency of air and we had hoped to control that reaction."

He then continues: "Our work with this first apparatus, to judge from this report, was not entirely satisfactory. We did not produce phthalic anhydride in commercial quantities. As our next work based on the data collected from the operation of this apparatus, we proceeded to design apparatus on the same principle involved in this, namely, the principle of boiling mercury to remove the heat as formed within the temperature zone, and as I said before on my direct examination, we took a mechanic and put him to school to learn how to weld, and various arrangements of equipment were made, and work was started in the construction of other apparatus. We begun immediately after taking the data that had been established by the experimental work in the laboratory which showed that the catalyst bulk had a definite relation to the heat removing surface, and we proceeded to build apparatus in accordance with the facts known and determined in the laboratory."

Without reciting all the steps and failures, we note that successful apparatus was finally constructed, of which the witness says: "While building converters for the Barrett Company each converter was operated, and the reason for the failure was noted on the next progressive step naturally followed when I was directing the work. This was the experience I got and used in making our final converter."

It will thus be seen that it required research, study, and experimentation covering a considerable period before the apparatus of the patent was finally devised. Able scientists in research laboratories were not successful in solving the problem, and it is quite apparent its final solution was not due to any advances in the art, for the art made no advance, but was due to the individual labors of the patentee, who used known appliances and known principles to construct an apparatus which the old art had never used or known of. In view of the able discussion of the case in the opinion of the court below, we avoid needless repetition by stating that on a study of the case we are satisfied to adopt the trial judge's reasoning as our own. The defendants by their use of Downs' apparatus evidence its worth, and we are satisfied the court below committed no error in holding the patent valid and that the defendant infringed.

So regarding, the decree below is affirmed.