## BARRETT CO. v. SELDEN CO.

### No. 1781.

District Court, W. D. Pennsylvania.
March 27, 1931.

R. T. M. McCready, of Pittsburgh, Pa., and Pennie, Davis, Marvin & Edmonds, W. B. Morton, and R. B. Canfield, all of New York City, for plaintiff.

Alter, Wright & Barron, George E. Alter, and R. A. Norton, all of Pittsburgh, Pa., and Newell & Spencer, of New York City, for defendant.

GIBSON, District Judge.

On February 27, 1929, by opinion filed in this court, plaintiff's patent was held to be valid and infringed. 32 F.(2d) 360. Upon motion for rehearing, the testimony was reviewed and given further consideration; the motion being denied. An opinion was filed with the order, which set forth the reasons therefor. 48 F.(2d) 619. The case was thereupon taken to the Circuit Court of Appeals, which, on July 11, 1930, affirmed the judgment. 47 F.(2d) 867. A petition for

a rehearing was then filed in the Court of Appeals. On November 14, 1930, before decision upon the motion, the appellant moved the Court of Appeals to remand the case to this court to consider alleged newly discovered evidence. The Court of Appeals did not pass upon the motion, but made an order which permitted appellant to present a petition to this court wherein we are asked to request the Court of Appeals to remand the record to the trial court in order that the decree may be vacated and the cause reopened for the purpose of considering newly discovered evidence. In due time both parties herein were heard in respect to the petition.

Upon hearing it developed that the newly discovered evidence of the appellant was the Belgian patent No. 147,959, dated February 15, 1900, granted to Emile Raynaud and Leon Pierron, for a new process for the manufacture of sulphuric acid. This patent came to the attention of counsel for the appellant a few days prior to the motion to remand in the Court of Appeals. Counsel had relied upon the fact that almost all Belgian patents are also found among those issued by France, Germany, and/or Great Britain. The patent under consideration was an exception to the rule, and counsel, who searched the patent lists of France, Germany, and Great Britain, but not that of Belgium, did not discover it prior to trial and appeal. While the failure to examine the Belgian patent lists, and to produce the patent when the case was heard, was quite natural, and was one likely to occur even with the most careful and diligent counsel, as here, it still must be admitted that counsel for the plaintiff below is correct in his assertion that the opposing party has not established all the facts which should exist before the court would be justified in granting a new trial by reason of after-discovered evidence. However, we do not desire to base our decision upon any question of laches, and have endeavored to carefully review the entire testimony of the case in conjunction with the Belgian patent.

The Belgian patent No. 147,959 is a process patent. It is termed by the patentees: "New Process of Manufacturing Sulphuric Acid." It contains no drawings of any apparatus designed to carry out the process, nor does it set forth a detailed description of any such apparatus. After stating that the apparatus proposed for use in carrying out the process was based upon the principle that a boiling liquid has a fixed temperature, the patentees described their apparatus as follows:

"The tube or other apparatus containing the catalytic bodies is surrounded by another tube or apparatus containing a liquid boiling at a fixed temperature. The heating takes place from the outside and may be produced by the passage of the gases which have to be cooled. The boiling may be more or less violent but the temperature remains fixed. * * *

"The tubes or apparatus containing the bodies may be arranged in a methodical series as in the Hargreaves apparatus which readily permits the obtaining of variations of content of the bodies or the variations of temperature and if necessary the suppressing of one or more of the elements without interrupting the working."

The Hargreaves apparatus, in the form it appears in publications exhibited to us, shows a set of ten cast-iron cylinders, each 18 feet in diameter and $12\frac{1}{2}$ feet high, arranged in two rows of five cylinders each. The multiplication of cylinders was for the purpose of taking care of progressive steps in the manufacture of sulphuric acid by passing the reaction gases successively through each of the cylinders containing the catalysts, which, incidentally, vary in strength. Thus different degrees of heat are created by the reaction in each cylinder. As stated in the Belgian patent:

" * * * This temperature (most favorable for the reaction between $SO^2$ and O), within certain limits (about 300 to 700° C.), is the lower the more the body is charged with platinum black or metals of the platinum group for the same gaseous mixture, or, for the same catalytic body, the less the gases are diluted and more nearly approach the formula $SO^2 + O$."

To accomplish the combination of sulphurous anhydride and oxygen, the Belgian patentees suggest, in conjunction with proposed means for maintaining a uniform temperature, a cylinder which contains catalytic bodies of low platinum content near the point of admission of the gaseous mixture, and below these bodies in the cylinder other catalytic bodies of higher platinum content, and below the last catalyst other bodies of less platinum content. By this arrangement, patentees state:

"It then follows that a notable portion of the gaseous mixture, while it is rich, is transformed from the start by bodies of low content and as it becomes impoverished it encounters bodies whose greater content completes the transformation; if the action has gone beyond the objective and a decomposition of the sulphuric acid formed has taken

place, the recombination then operates in contact with bodies of lower content."

It would doubtless be presumptuous on our part to express the opinion that the patentees' 3 in 1 cylinder would be commercially inoperative by reason of the impossibility of long preserving the exact relations necessary between the strength of the gaseous mixture and the strength of the catalysts, and the variations in heat of the reactions in the different parts of the cylinders, although such an opinion would have some justification in the fact that patentees' suggestion has never advanced beyond the obscure paper patent stage in so far as the manufacture of sulphuric acid is concerned. Whether or not our doubt in this respect is well founded, it is apparent that material differences exist in the process suggested by the Belgian patent and that contemplated by Downs. In the sulphuric acid reaction, excess of heat at an early or middle stage of the reaction may cause a decomposition of the sulphuric acid, but the elements may recombine upon being brought in contact with a weaker catalyst; but, in the phthalic anhydride reaction, the partial oxidation of a product, excess of heat ruins, and insufficient heat, if it does not absolutely destroy, results in an inferior product. It will be noted that the problems of the respective patentees were not identical, but a still more material difference exists. The Belgian patent was for a process, while Downs' patent was for a specific apparatus. It is true that the Belgian patentees have mentioned apparatus, supra, as suitable for their proposed reaction. No drawings of such apparatus have been made a part of the petition for the patent, and the description leaves much—too much, we think—to be imagined. It discloses the patentees' 3 in 1 cylinder within another cylinder containing boiling paraffin or oil; the heating being "from the outside and may be produced by the passage of the gases which have to be cooled." The patentees also possibly contemplated surrounding with the boiling liquid a series of cylinders each containing uniform catalyst bodies but of different platinum content. With the Downs patent before us, it is not difficult to imagine the Belgian patent apparatus as a general application of the same means and principles used by Downs. We can attach the condenser, or even the means for varying the pressure upon the boiling liquid, to the proposed Belgian apparatus, although these features are unmentioned in the patent; but getting no light from Downs, and considering the proposed apparatus in connection with the state of the art at the time, it must be agreed that the description is exceedingly vague. The patentees may have had a clear idea as to the method by which the surrounding fluid was to be heated by the passage of the hot gases of the reaction, but they certainly have not disclosed it. When we consider the magnitude of the apparatus in use at the time for the manufacture of sulphuric acid, and the necessary thickness of the walls of the catalyst cylinder, we know that Raynaud and Pierron did not contemplate the intimate heat relation between the reaction within the catalyst cylinder and the surrounding fluid which was one of the main features of the Downs apparatus, with its attenuated tubes. As we view the patent, it cannot be held to be an anticipation of Downs. It does propose to apply certain of the principles and means of which Downs made use, but, as pointed out in our original opinion, the novelty disclosed by the Downs patent did not consist in any chemical discovery, but in specific apparatus which used and applied old principles and well-known means in such a way as to attain new results and bring about an advance in the manufacture of phthalic anhydride, or in the promotion of exothermic catalytic reactions which could be successfully performed only within narrow limits of temperature.

Counsel for the defendant, in their able and forcible presentation of their petition for the request to remand the cause, do not assert that the Raynaud and Pierron patent is a complete anticipation of the Downs patent. They are willing, at least for purposes of argument, to admit that the latter patent is valid, but only to a very limited degree. They are willing to admit that the Belgian patent adds nothing to the record with respect to the claims which specify mercury as the liquid to be used, or to those claims which add means to change the boiling point of the liquid by regulating the pressure upon it.

The Downs apparatus was evolved for use in the manufacture of phthalic anhydride, and possibly its utility may be confined to such manufacture, or to other exothermic reactions which occur at substantially the same temperature. The surrounding liquid, if the apparatus is to be commercially effective, must have in common with mercury the quality of being able to withstand long boiling without breaking up or suffering material deterioration, but we can see no reason for limiting the patent to apparatus which uses mercury as the liquid part. It may be that many liquids exist which possess that necessary quality. In our view of the Downs pat-

ent, although it combines many well-known chemical and physical principles, it is not to be put in the category of those patents which disclose some slight improvement upon a basic patent, and consequently to be confined within very narrow limits. If the only novelty in the Downs apparatus were the use of mercury as the bath, the patent would be invalid, because mercury had been so used, in different apparatus, prior to Downs. The same thing is true in respect to the means for varying the pressure upon the liquid bath. The mere addition of such means, or the use of such means plus mercury as the surrounding liquid, did not, in itself, constitute patentable novelty. The apparatus as a whole was new and brought about a distinct advance in the phthalic anhydride art. Of that whole, however, the pressure means, although an advantageous element, was not an absolute essential to operation. It was used only when the catalyst deteriorated. In our opinion, the validity of the patent is not limited to those claims which specifically designate mercury as the liquid of the bath, and set out means for varying the pressure; or, conversely, those claims are valid (as limited by the description) which do not specify mercury as the bath and do not include pressure means.

We have endeavored to examine and weigh the force of the Reynaud and Pierron Belgian patent with that degree of care demanded by the force and ability of the counsel presenting it. That examination has not led us to the conclusion that our original decision would have been other than it was if that patent had been offered in the original trial. This being so, the petition of the defendant, praying this court to seek the remand of the case from the Circuit Court of Appeals, must be denied.